# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KINDALL NEALE, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. JKB-20-1219 |
| LAWRENCE J. HOGAN, *Governor of Maryland,* | * | |
| BOYD K. RUTHERFORD, *LT. Governor,* | * | |
| ROBERT L. GREENE, *Secretary of Public Safety and Correctional Services,* | * | |
| WAYNE HILL, *Commissioner of Corrections,* | | |
| WALTER WEST, *Warden of ECI,* and | * | |
| WALTER HOLMES, *Assistant Warden* | | |
| | * | |
| Defendants. | | |

\*\*\*

## MEMORANDUM OPINION

Plaintiff Kindall Neale filed this civil rights action along with multiple supplements to the Complaint asserting that his health has been jeopardized due to Defendants' handling of the COVID-19 pandemic at Eastern Correctional Institution ("ECI") located in Westover, Maryland. ECF Nos. 1, 4, 5, 6, 7. In response, Defendants Hogan, Rutherford, Greene, Hill, West, and Holmes filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, addressing both the COVID-19 protocols at ECI and asserting that Plaintiff failed to exhaust his administrative remedies prior to filing his Complaint. ECF No. 15. Plaintiff responded to the motion. ECF Nos. 21[1] and 22. On August 19, 2021, this court entered a Memorandum Opinion and Order finding

---

[1] In his response to the dispositive motion, Plaintiff alleges that he was removed from his cell on February 18, 2021, for kicking his cell door and was moved on to another tier and housed with an inmate who was already being quarantined. ECF No. 21 at 1, 2. The cell was dirty. Ultimately, Plaintiff states he took a deal for the infraction and lost good time credits. *Id.,* at 2. While in quarantine his legal mail was withheld. *Id.* Plaintiff states that the foregoing conduct was retaliatory. *Id.* He also states that he has filed several sick call slips regarding kidney pain and has not received proper medical care. *Id.* at 3. These claims are not properly before the court and will not be considered. The

that Plaintiff failed to exhaust his administrative remedies under the Prisoner Litigation Reform Act and, finding that Plaintiff therefore failed to state a claim under Federal Rule of Civil Procedure 12(b)(6), and dismissed the case without prejudice. ECF Nos. 25 and 26. On October 21, 2022, the Fourth Circuit Court of Appeals vacated the August 19, 2021 Order, determining that Plaintiff had sufficiently alleged that the exhaustion process was not available to him and remanding the case for further proceedings. ECF No. 33. The Court's mandate issued on November 14, 2022. ECF No. 34.

Thereafter Plaintiff filed a Motion to Appoint Counsel. ECF No. 36.[2] Plaintiff states that he is unable to afford counsel, he has made efforts to obtain counsel, and his incarceration will limit his ability to prosecute the case, and he would be better able to present evidence at trial with the assistance of an attorney. ECF No. 36. A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is discretionary and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). Plaintiff has not offered any exceptional circumstances warranting the appointment of counsel and the Motion will be denied.

Plaintiff also filed a Motion for Default Judgment (ECF No. 38), erroneously contending that Defendants failed to respond to his Complaint. As noted, Defendants filed a dispositive motion (ECF No. 15), to which plaintiff responded. The Motion for Default will be denied.

---

court may not address these new claims because an opposition to a dispositive motion is not a vehicle for amending a pleading. *Mylan Laboratories, Inc. v. Akzo, N. V.,*770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd,* 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd,* 141 F.3d 1162 (4th Cir. 1998). *Woodbury v. Victory Van Lines,* 286 F.Supp.3d 685, 692 (D. Md. 2017) (stating it is axiomatic that a plaintiff may not use their memorandum in opposition to amend the complaint).

[2] A "Supplemental Motion to Appoint Counsel" (ECF No. 37) was docketed on February 2, 2023. The Supplemental Motion is duplicative in all material respects to the first Motion.

2

The court finds that the matter has been fully briefed and a hearing in this matter is unnecessary. *See* Local Rule 105.6. (D. Md. 2021). For the reasons explained below, the Complaint is dismissed as to Defendants Rutherford, Greene and Hill. Defendants Hogan, West, and Holmes' motion, construed as a motion for summary judgment, will be granted.

## Background

### A. Plaintiff's allegations

Plaintiff's Complaint was received by the court for filing on May 13, 2020. ECF No. 1. Plaintiff states in his Complaint and its various supplements that Defendants failed to assure his safety relative to the COVID-19 pandemic. ECF Nos. 1, 4, 5, 6, and 7.

In his initial Complaint, Plaintiff stated:

> Corona virus pandemic hits the United States in Jan 2020 the defendants don't take proper actions to protect me from harm due to I am incarcerated and they believe that I am safe. At no point have I been checked by the medical staff here at ECI. I am 38 year old man that is very much concerned for my health and safety. I don't have a death sentence. I am housed in a cell with another man with less than 6 feet between us.

ECF No. 1 at 2. In his first supplement he alleges, generally, that Defendants should have taken immediate action in January of 2020 to protect his safety, but that social segregation was not implemented until April 6, 2020. ECF No. 4 at 2–3. He also alleges that he was not provided adequate cleaning supplies with which to clean his cell. *Id.* at 3. He claims his safety was threatened by being housed in a cell with another prisoner. *Id.* at 3. Plaintiff states that there were numerous safety deficiencies including a lack of cleaning supplies, correctional officers not properly wearing face masks, common areas not being properly disinfected, and a lack of social distancing in recreation areas. ECF No. 4 at 5–6; ECF No. 5 at 1–5, 7–19; ECF No. 6 at 3–11; ECF No. 7 at 1–11; ECF No. 19-1. Plaintiff reports that the threat of contracting COVID-19 has been stressful. ECF No. 1, 4, 5.

3

In his "Motion for Evidence" (ECF No. 20), Plaintiff alleges additional facts in support of his Complaint. Plaintiff states that "Defendants" moved an inmate who had tested positive for COVID-19 and who was in quarantine into a cell on his tier. *Id.* at 1. "Defendants" left other inmates in general population housing after they each tested positive for COVID-19. *Id.* at 2. He alleges that inmates were transferred from the Maryland Reception Diagnostic and Classification Center to ECI-West Compound without having been tested from COVID-19. *Id.* In his "Motion to Amend" (ECF No. 23), plaintiff seeks to add additional facts in support of his allegations that Defendants failed to implement and comply with COVID-19 safety protocols. Specifically, Plaintiff alleges that inmates were transferred from other facilities without COVID-19 testing and that a guard was coughing while on his shift but told Plaintiff he was not allowed to go home. *Id.* at 3.

### B. Defendants' Response

Defendants filed a substantive response detailing the safety measures that were put in place at ECI, including providing cleaning supplies to prisoners, social distancing in recreation areas, and providing COVID-19 testing to inmates with "flu like" symptoms. Decl. of Walter West, ECF No. 15-4 at 1–2, ¶ ¶ 5, 6, 8, 9.

On March 5, 2020, the Governor of Maryland issued a state of emergency proclamation relative to the COVID-19 pandemic. ECF No. 15-3 at 1–2.[3] The following week, on March 12, 2020, the Governor issued an order that limited large gatherings in public spaces. *Id.* at 3–5. On March 16, 2020, the March 12, 2020 Order was revised limiting large gathering in public spaces

---

3    As this court has previously recognized, in order to combat COVID-19 Governor Hogan used "the emergency powers granted to him by the state legislature, has issued a series of executive orders designed to slow the spread of the disease and to protect the health of Maryland residents. In so doing he has consulted and relied on the advice of acknowledged public health professionals." *Antietem Battlefield KOA, et al., v. Lawrence J. Hogan, et al.*, Civil No. CCB-20-1130, 2020 WL 2556496 *1; ECF No. 15-9.

to 50 people. *Id.* at 6–9. Thereafter, on March 19 the Governor revised the Order and issued Executive Order 20-03-19-01, limiting gathering in certain circumstances to no more than ten people. *Id.* at 10–13. The orders were revised by Executive Order 20-06-10-01 on June 10, 2020, encouraging social distancing without specifying the number of persons who could gather. *Id.* at 18–28. On July 29, 2020, the Governor issued Executive Order 20-07-29-01 which amended and restated the prior order and included the reopening of certain businesses and required facial coverings in certain settings. *Id.* at 29–40. Executive Order No. 20-08-03-01, issued August 3, 2020, amended and restated the prior orders. *Id.* at 41–52. The Governor issued Executive Order Nos. 20-11-17-01 and 20-11-17-03, on November 17, 2020, renewing the March 5th Order declaring a state of emergency and catastrophic health emergency and ordering the implementation of "alternative correctional detention and supervision." *Id.* at 53–69.

On April 15, 2020, effective April 18, 2020, the Governor issued Executive Order No. 20-04-15-01 which required members of the public wear face coverings when riding public transportation and when in a retail or food service establishment. *Id.* at 14–17. The term "Face Covering" was defined as a covering that fully covered a person's nose and mouth but was not Medical-Grade and included scarves and bandanas. *Id.* at 15. On August 3, 2020, Executive Order 20-0803-01 rescinded Executive Order No. 20-04-15-01. *Id.* at 41. The August 3, 2020 Order stated that the Coronavirus Recovery Team advised that the widespread use of Face Coverings was likely to help control the spread of COVID-19 and defined facial coverings to also include plastic full-face shields. *Id.* pp. 41–52.

Sharon Baucom, M.D., Director of Clinical Services for the Maryland Department of Public Safety and Correctional Services ("DPSCS") since June of 2011, avers that as of May 26, 2020 and August 6, 2020, neither medical or societal standards required universal testing for

5

COVID-19. ECF No. 15-10, at 1, ¶ 3; at 3, ¶ 3.[4] At that time, accepted medical practice prioritized COVID-19 testing based on a patient's illness and particular circumstance. *Id.* At the time complained of in Plaintiff's Complaint, DPSCS, through its health care contractors provided testing consistent with guidelines issued by the Centers for Disease Control and Prevention. *Id.* By August 6, 2020, all Maryland Division of Correction personnel, medical staff, and inmates had the opportunity to be tested for COVID-19. ECF No. 15-10 at 3, ¶ 3. Dr. Baucom further explains that, within DPSCS, inmates suspected to have or who are confirmed to have COVID-19 are treated by DPSCS's private medial contractors and are placed in quarantine or isolation as medically appropriate. *Id.* at 4, ¶ 4. In order to be released from COVID-19 quarantine or isolation a medical order is required. *Id.* No such order was issued unless the inmate had recovered from COVID-19 and was symptom-free. *Id.* The order releasing the inmate from quarantine/isolation allows the inmate to then be housed anywhere in the facility. *Id.* Dr. Baucom explains that there was no further medical intervention required as to an inmate's housing when they are medically released form COVID-19 quarantine or isolation. *Id.* Dr. Baucom avers that "correctional officials and medical staff [must] be able to assess and prioritize in real time implementation of reasonable precautions to minimize the impact of COVD-19 on the inmate population and staff based on evolving information and resources." *Id.* at 3, ¶ 2.

As to specific precautions undertaken at ECI, Walter West, Warden of ECI, avers that during the time relevant to the Complaint, Plaintiff was a general population inmate assigned to ECI-East, Housing Unit 7, with one cellmate. ECF No. 15- 4 at 1,  ¶¶ 1, 2;  ECF No. 15-4 at 77. ECI is divided into an East and West compound which are separated by a fence. ECF No. 15-4 at 1, ¶ 2. At the time of the filing of Defendants' dispositive motion, the East compound had 233

---

[4] Defendants provide affidavits of Dr. Baucom, which were submitted in other cases concerning COVID-19 protocols within DPSCS.

custody staff, the West compound had 299 custody staff, and each compound had approximately 1,400 inmates. *Id.*

On January 8, 2021, ECI began to offer COVID-19 vaccinations. ECF No. 15-4 at 1, ¶ 3. At that time, front line workers, medical and custody staff who came into contact with potentially COVID-19 positive inmates, were vaccinated. *Id.* At the time of the filing of the dispositive motion on January 15, 2021, West was advised that the number of vaccines available to DPSCS and the date the vaccines would be received were not known, but he anticipated it would take approximately 45 days from that date to receive a sufficient supply of vaccine with which to vaccinate all of the health care workers and front line corrections staff in Maryland. *Id.*

In early March of 2020, ECI began to implement COVID-19 precautions. ECF No. 15-4 at 1, ¶ 5. ECI began to modify the movement of inmates including social distancing and increased sanitation efforts, as early as March 19, 2020. *Id.* At the time of filing of the dispositive motion, inmates remained on modified movement due to the pandemic. *Id.*

On March 31, 2020, DPSCS issued "Secretary's Directive Number EmD. DPSCS.0550.0012 COVID-19 Utilization of Protective Equipment and Additional Levels of Protection." ECF No. 15-4 at 1, ¶ 4; ECF No. 15-4 at 5–10. On April 13, 2020, a memorandum was issued to all Wardens and other administrative personnel concerning the procedures for admission and discharge of COVID-19 cases in isolation and quarantine. ECF No. 15-4 at 1, ¶ 4; ECF No. 15-4 at 11-12.

By April 20, 2020, ECI had received enough cloth face masks to distribute them to the inmate population on both compounds. ECF No. 15-4 at 2, ¶ 5. The distribution of cloth face masks was completed by November 5, 2020. *Id.* Additionally, the institution began to distribute

7

meals to the inmates in their cells using Styrofoam trays and bag meals for breakfast. ECF No. 15-4 at 2, ¶ 5.

Inmates were provided weekly sanitation supplies, including disinfectant, to clean their cells. ECF No. 15-4 at 2, ¶ 5. Cells at ECI have hot and cold running water, a sink, and a toilet. *Id.*, ¶ 6. Inmates are provided soap. *Id.* Inmates are permitted showers on a rotating basis with no more than ten inmates at a time. The showers were cleaned between each group of inmates.[5] *Id.* Inmates also maintained access to laundry services in their housing unit. *Id.*

The inmates were placed on a "Social Distancing Modified Recreation" schedule. ECF No. 15-4 at 2, ¶ 5. Initially, both the East and West compound courtyards were closed but in December 2020, reopened to allow outdoor recreation and socialization by one tier at a time. *Id.* Social distancing and the use of facial masks were required while using the courtyard. *Id.* Additionally, general population inmates, such as Plaintiff, were allowed indoor recreation, which consisted of inmates from five cells, with no more than ten inmates, participating in recreation for one hour, on rotating days, in the dayroom.[6] *Id.* After each recreation period the area was sanitized with particular focus on telephones, tables, showers, and door handles. *Id.* Inmates were allowed video visits and provided free fifteen-minute phone calls weekly. *Id.*

Inmates could participate in religious worship in their cells: all other programming and services were suspended. ECF No. 15-4 at 2, ¶ 5. West avers that procedures for services and programming were modified as necessary in order to safeguard the administration of the facility. ECF No .15-4 at 2, ¶ 5; ECF No. 15-4 at 41, 78.

---

[5] In Plaintiff's view, the inmates assigned to clean the showers were not provided enough time to do so and the cleaning supplies provided were insufficient. ECF No. 5.

[6] Plaintiff contends that, on a number of occasions, 11 to 13 inmates were permitted in the recreation area at a time. ECF No. 5; ECF No. 19-1.

As to medical and mental health care, West explains that, at the relevant time complained of, inmates at ECI continued to have access to medical and mental health care. ECF No. 15-4 at 2, ¶ 7. Specifically, a medical professional made rounds on each tier three times a day to determine if there were medical concerns. *Id.* If an inmate had a complaint or demonstrated a health concern, they were directed to write a sick call slip. *Id.* Co-pays for sick calls during this time were suspended. *Id.* After review of the sick call slip, and any observation of the inmate by medical staff, an appointment would be scheduled as appropriate. *Id.* Inmates were also authorized to submit sick call slips to nursing staff while they were on the unit during pill call or whenever they came into contact with nursing staff on the tier. *Id.* Inmates receiving mental health care continued to be treated. *Id.*

Any inmate exhibiting flu like symptoms was to be isolated, sheltered in place, and evaluated by medical staff as soon as possible. ECF No. 15-4 at 2, ¶ 8. Medical providers were responsible for ordering the testing for COVID-19 for inmates who displayed flu like symptoms. *Id.* Other inmates who were in close proximity to an inmate demonstrating such symptoms were to be placed on bed rest with feed-in until cleared by medical staff. *Id.*

Inmates with COVID-19 symptoms were to be placed in isolation in a separate area until released by medical staff. ECF No. 15-4 at 2, ¶ 8. Prior to November, 2020, inmates who tested positive were placed in the isolation area and their cell buddy moved to quarantine. *Id.* Once the first isolation area reached capacity, another separate area was designated for COVID-19 isolation. *Id.* The duct work in the isolation cells was sanitized. *Id.* at 3, ¶ 8. In November of 2020, due to spacing concerns, and pursuant to medical protocol, asymptomatic inmates who tested positive for COVID-19 were placed on bed rest in their cell and were permitted to shower alone. *Id.*

9

If necessary, inmates were transported to an independent regional medical center for medical treatment. ECF No. 15-4 at 3, ¶ 8. Vehicles used to transport inmates are sanitized between each transport. ECF No. 15-4 at 3, ¶ 8; ECF No. 15-4 at 14-20. Additionally, a procedure was developed for the discharge of COVID-19 inmates with precautions to prevent transmission. ECF No. 15-4 at 3, ¶ 8; ECF No. 15-4 at 21.

West explains that, at the time relevant to the Complaint, staff entered the facility in the Visiting Registration Center/Lobby and practiced social distancing while at work. ECF No. 15-4 at 3, ¶ 9. Third party expert cleaners deeply cleaned and sanitized the Visiting Registration Center/Lobby areas, intake areas, annex visiting room, and transportation vehicles. *Id.* No more than ten people were permitted in the Visiting Registration Center/Lobby area at a time and all were required to socially distance. *Id.* Additionally, the property tubs were cleaned after each use, staff changed gloves between pat downs, and countertops cleaned multiple times during the day. *Id.* Staff were screened and those with flu-like symptoms or a temperature of 100.4 or higher were evaluated and sent home. Staff were required to wear a face mask and face shield to enter the facility. Correctional staff were trained as to the correct use of personal protective equipment and social distancing. *Id.* ¶ 10. Staff were required to wear face masks, face shields, and gloves in the facility but were not required to wear them in the officer dining room. *Id.* Posters were placed throughout the facility encouraging social distancing and frequent hand washing. *Id.* ¶ 11; ECF No. 15-4 at 23-37.

Additionally, pursuant to the Governor's Executive Order, DPSCS worked to ascertain which inmates were eligible for early release. ECF No. 15-4 at 3, ¶ 12. At the time of filing of their dispositive motion, ECI had finished the evaluation process for providing early release to

eligible inmates and was then working to determine whether any other inmates qualified for home detention. *Id.*

From June 8 through 12, 2020, all ECI inmates were tested for COVID-19. ECF No. 15-4 at 3, ¶ 13. Thereafter serial testing of the entire inmate population continued on a weekly basis as determined by medical personnel. *Id.* Staff underwent their first mandatory testing on June 8 and 9, 2020, with monthly testing of staff continuing thereafter. *Id.*

ECI underwent audits of their COVID response on May 7, 2020, July 27, 2020, November 4, 2020, and December 30. 2020. ECF No. 15-4 at 3, ¶ 15. Where necessary, corrective action was taken as a result of the audit. *Id.*; ECF No. 15-4 at 42–64. West avers that the isolated incidents of non-compliance with COVID protocols noted in the audits were addressed. *Id.* Where an inmate or staff disobeys the mandate regarding use of PPE they are progressively disciplined. *Id.* In West's view, "sound penological practice requires that correctional officials and medical staff be able to assess and prioritize in real time the implementation of reasonable precautions to minimize the impact of COVID-19 on the inmate population and staff based on current and evolving information and resources." ECF No. 15-4 at 4, ¶ 16.

Plaintiff was tested for COVID-19 on June 8 and September 10, 2020 and on each occasion tested negative. ECF No. 15-5 at 2–3. On April 22, 2020, Plaintiff filed a sick call slip requesting a physical. *Id.* at 4. A nurse responded to the request advising Plaintiff that he had been seen on March 9, 2020 and physicals were being scheduled when they were due. *Id.* He was asked whether anything was "going on" that prompted the request and if so to respond and explain. *Id.*

Defendants explain that there is no evidence Plaintiff wrote to the Warden or Assistant Warden regarding any matter. ECF No. 15-4 at 3, ¶ 14. Plaintiff filed a number of administrative remedy requests referencing COVID-19 beginning in July of 2020:

11

**ARP ECI-0605-20** filed on July 8, 2020 alleged individuals grabbed ice with their bare hands. He withdrew the ARP. ECF No. 15-6 at 3–7;

**ARP ECI 1036-20** filed on November 18, 2020 complained of the lack of soap. ECF No. 15-6 at 10;

**ARP ECI-1049-20** filed on November 20, 2020 complained of the lack of soap. Both ARPs (1036-20 and 1049-20) were investigated and dismissed as without merit because soap was provided and Plaintiff had money to purchase additional soap. ECF No. 15-6 at 10-15;

**ARP ECI 1084-20** filed on November 30, 2020 alleged he had not been provided breakfast. The ARP was investigated and dismissed after it was determined Plaintiff failed to comply with policy regarding receipt of his food and he refused to wear a mask as an officer approached to provide a food tray. ECF No. 15-6 at 12-17;

**ARP ECI 1120-23** filed on December 7, 2020, complained staff failed to properly wear a mask while cleaning a cell. The ARP was dismissed after investigation. ECF No. 15-6 at 18-22;

**ARP ECI-1137-20** filed December 10, 2020, complained that an employee failed to properly wear his mask. The ARP was withdrawn. ECF No. 15-6 at 29-31.

## Standard of Review

Defendants' dispositive motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, in deciding a Rule 12(b)(6) motion, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). *See Kensington Vol. Fire Dept., Inc. v.*

12

*Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam).

The Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion as one for summary judgment "in the alternative" and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Plaintiff was provided such notice. He also received notification from the Clerk of Defendants' dispositive motion and had the opportunity to reply with exhibits and declarations and has done so. Thus, conversion of Defendants' motion to one for summary judgment is appropriate and this court will consider the exhibits filed.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Shaw*, 2023 WL 1486310, at *4; *Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for

13

discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. *See Shaw*, 2023 WL 1486310, at \*4; *Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021); *Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit acts at his peril, because "the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Harrods*, 302 F.3d at 244 (citations and quotations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary

14

judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Plaintiff has not requested discovery under Rule 56, nor has he filed an Affidavit in compliance with Rule 56(d). In both his Motion for Summary Judgment (ECF No. 19 at 2) and Supplement to Response in Opposition (ECF No. 22 at 7), Plaintiff requests that "camera footage" be subpoenad or summoned "as evidence to support" his timeline of events. Presumably Plaintiff means that the camera footage from inside the institution during the time at issue would support his claims regarding the prison's response to COVID-19. Plaintiff offers no argument as to why this information is essential to his opposition. Nor does Plaintiff explain how that information would create a genuine issue of material fact sufficient to defeat summary judgment. As such,

Plaintiff's request for additional information is denied and the court shall consider Defendants' motion as one for summary judgment.

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48 (emphasis in original). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).

The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). At the same time, the court must "prevent factually unsupported

16

claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## Analysis

Plaintiff explains that "[t]he defendants have violated [his] 5th, 8th, and 14th Amendment Rights." ECF No. 4 at 3. He explains that he brings a Fifth Amendment claim based on "this pandemic and [Defendants'] failure to provide [him] with proper protection" and that he brings Eighth and Fourteenth Amendment claims "on the grounds that it is cruel and unusual punishment not to provide proper cleaning supplies to clean my cell and to house me another during a dangerous pandemic." *Id.* In their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, Defendants seek dismissal under Rule 12(b)(6) or summary judgment under Rule 56. Defendants' arguments include that: (1) they are entitled to Eleventh Amendment immunity on the claims asserted against them in their official capacity; (2) Plaintiff failed to state a claim; (3) Plaintiff failed to allege personal participation as to any of the named Defendants; (4) Plaintiff failed to establish an Eighth Amendment violation; (5) Plaintiff has failed to state a due process claim regarding the failure to follow Defendants' own policies; and (6) Defendants are entitled to qualified immunity. ECF No. 15.

### A. Eleventh Amendment

Defendants assert that they are immune from the claims against them in their official capacities based on the Eleventh Amendment to the Constitution, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. In effect, the Eleventh Amendment bars suits for damages against a state in federal court unless the state has waived

sovereign immunity or Congress has abrogated its immunity. *See Pennhurst State Sch. & Hosp.*

*v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit

in which the State or one of its agencies or departments is named as the defendant is proscribed by

the Eleventh Amendment."). "[A] suit against a state official in his or her official capacity is . . .

a suit against the official's office" and thus is the equivalent of "a suit against the State itself." *Will*

*v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Although Maryland has waived its sovereign immunity for certain types of cases brought

in state courts, *see* Md. Code Ann., State Gov't § 12-201(a), it has not waived its immunity under

the Eleventh Amendment to a suit of this kind in federal court. Each of the Defendants in this case

is a state official or employee. Accordingly, Eleventh Amendment immunity applies to the official

capacity claims for monetary damages, and those claims will be dismissed.

### B. Personal Participation

Plaintiff does not explain how Defendants Rutherford, Greene, or Hill's actions or

inactions violated his constitutional rights. Liability under §1983 attaches only upon personal

participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402

(4th Cir. 2001). Other than being named in the case caption, these defendants are not mentioned

anywhere in the factual allegations of the Complaint. Because no facts are alleged against

Defendants Rutherford, Greene, or Hill they are each entitled to dismissal.

Plaintiff contends that Governor Hogan and unspecified prison officials should have acted

earlier—in January and February of 2020—in responding to the COVID-19 pandemic. ECF No.

5. He claims that Warden West's directives regarding COVID-19 precautions were not followed

by individual prison staff and that Warden West did not ensure that Plaintiff was given sanitation

supplies. *Id.* He states that Assistant Warden Holmes visited his housing unit on several occasions. ECF No. 5, 7.

With respect to Governor Hogan, Warden West, and Assistant Warden Holmes, it is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock*, 275 F.3d at 402 (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Plaintiff has failed to include factual allegations to support a claim of supervisory liability on behalf of Governor Hogan, Warden West, or Assistant Warden Holmes, as he fails to demonstrate that Hogan, West, or Holmes, had any knowledge that front line correctional staff failed to adhere to policies implemented to curb the spread of COVID-19 and/or failed to take any corrective action once aware. Further, Plaintiff has failed to demonstrate any injury caused by the conduct of Hogan, West or Holmes. Thus, they are entitled to dismissal.

19

C. **Eighth Amendment Claims**[7]

Even if Plaintiff established that Defendants Hogan, West, and Holmes's involvement in the matters alleged was more than as supervisors, for the reasons that follow, they would be entitled to summary judgment on his claim of cruel and unusual punishment.

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976). Notably, it "proscribes more than physically barbarous punishments" and "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . .'" *Estelle*, 429 U.S. at 103 (citation omitted). In short, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

Additionally, the protection provided by the Eighth Amendment compels prison officials "to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319–20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834. The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to a substantial risk of serious harm, and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Farmer*, 511 U.S. at 834, 837–38.

---

[7] Plaintiff invokes the Fifth Amendment as the source of his claim (ECF No. 4 at 3), however his claim is properly construed as being brought under the Eighth Amendment. The Fifth Amendment, among other things, prohibits "depriv[ation] of life, liberty, or property without due process of law" by the *federal government* which is not a party to these proceedings.

Construed liberally, Plaintiff's contentions regarding the management of the COVID-19 virus at ECI raises either conditions claims or an allegation that the Defendants failed to protect him. Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In order to establish cruel and unusual punishment in conditions of confinement, a prisoner must prove that "the deprivation of [a] basic human need was *objectively* sufficiently serious, and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). Similarly, to establish a failure to protect claim, a prisoner must show: first, that he suffered significant injury or was "'incarcerated under conditions posing a substantial risk of serious harm;'" and second, that the prison official at issue had a "'sufficiently culpable state of mind.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 834).

The objective prong of a conditions of confinement claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)); *accord De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment,

21

even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).

To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known, excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson v. Seiter*, 501 U.S. 394, 302-03 (1991) (applying the deliberate indifference standard to conditions of confinement claims); *see also Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 107 (4th Cir. 2017). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corrs.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). To survive summary judgment, Plaintiff must show facts sufficient for a reasonable factfinder to conclude that (1) he was exposed to a substantial risk of serious harm and (2) the defendants knew of and disregarded that risk. *Thompson*, 878 F.3d at 107 (citing *Farmer*, 511 U.S. at 834, 837–38) (internal quotations omitted).

In considering Plaintiff's claims, it is necessary to understand the context in which they were brought. On March 11, 2020, COVID-19 was declared a global pandemic by the World Health Organization. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[8] The country was suddenly plunged into "the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). The COVID-19 health crisis has been described as the worst public health crisis since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020)

---

[8] The court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201. Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last visited Mar. 27, 2023).

("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). The pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). Plaintiff filed his complaint on May 13, 2020, approximately two months after the declaration of the global pandemic.

In the context of the COVID-19 pandemic, courts have found that a plaintiff "must provide more than generalized allegations that the [defendants] ha[ve] not done enough to control the spread" of COVID-19. *Blackwell v. Covello*, No. 2:20-CV-1755 DB P, 2021 WL 915670, at *3 (E.D. Cal. Mar. 10, 2021); *see also Hope v. Warden*, 972 F.3d 310, 330 (3rd Cir. 2020) (rejecting petitioners' arguments that exposure to COVID-19 was per se unconstitutional and that the government must entirely eliminate their risk of exposure in order to comply with constitutional mandates). Courts that considered allegations similar to those presented in Plaintiff's Complaint have concluded that they do not support a claim of deliberate indifference. *See, e.g., Knight v. Watts*, Civil Action No. ELH-21-56, 2022 WL 80637, at * 13 (D. Md. Jan. 6, 2022) (granting summary judgment to defendants because efforts at mitigating spread of COVID-19 demonstrated they were not deliberately indifferent); *Reinhardt v. Hogan, et al.*, Civil Action No. DKC-20-1011, 2021 WL 82894 at * 6 (D. Md. Jan. 11, 2021) (dismissing complaint for failure to state a claim regarding ECI's efforts to fight COVID-19 where Plaintiff failed to show injury); *Wylie v. Bonner*, No. 2:20-cv-2593-TLP-tmp, 2021 WL 261280, at *4–6 (W.D. Tenn. Jan. 26, 2021) (finding that inmate failed to state an Eighth Amendment conditions of confinement claim because he failed to allege that staff knew of and disregarded the risks posed by COVID-19); *Kesling v. Tewalt*, 476 F. Supp. 3d 1077, 1086–88 (D. Idaho 2020) (noting that "[a]t first, it was unclear whether cloth face

23

masks would be particularly effective in curbing the spread of the virus" and "it was not unreasonable for prison officials to refrain from requiring face masks in the early months of the pandemic, particularly when access to such masks was limited"); *McKissic v. Barr*, No. 1:20-cv-526, 2020 WL 3496432, at *6 (W.D. Mich. June 29, 2020) (finding that an inmate's "speculation about the mere possibility that he will become infected by the virus does not rise to the level of an Eighth Amendment violation").

While Plaintiff may be able to satisfy the first prong of an Eighth Amendment claim, that COVID-19 poses significant health risks, he has not shown the second subjective prong. To the contrary, prison authorities were aware of the risks of COVID-19 and took measures to ameliorate the risks of spreading the virus. Safeguards such as the ones in place at ECI have been upheld as a reasonable response to the COVID-19 threat.

In *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020), the Sixth Circuit noted that the COVID-19 virus created "a substantial risk of serious harm," *id.* at 840, but reversed the lower court's grant of preliminary injunctive relief because Defendants had implemented safeguards including screening inmates, staff, and visitors for symptoms; isolating and quarantining inmates exposed to the virus; implementing limitations on movements into and within the facility; testing of inmates and staff; mandating extensive cleaning efforts; providing access to cleaning supplies; educating inmates and staff about the virus; and providing PPE to both staff and inmates, which constituted evidence that prison officials were not deliberately indifferent to the risk posed by COVID-19. *Id.* at 841. The court concluded that "while the harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted,' the [Bureau of Prisons] has 'responded reasonably to the risk' and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights."

24

*Id.*; *see also Dove v. Gang*, No. CV DKC-20-1145, 2020 WL 4262269, at \*3 (D. Md. July 24, 2020) (discussing *Wilson*, 961 F.3d at 839, 841).

Similarly, numerous safeguards were implemented at ECI, including the education of inmates and staff regarding COVID-19; frequent cleaning of ventilation systems and common areas; distribution of cleaning products; auditing of protocols; distribution of masks and other personal protective equipment; social distancing of staff and inmates; routine testing of inmates and staff; and, eventually, offering COVID-19 vaccines to both staff and inmates.[9]

The evolving protective measures enacted throughout the State of Maryland and specifically at ECI were wide-ranging, and the facility clearly strove to comply with measures believed to decrease the dangers of spreading COVID-19 through the facility. Even assuming, *arguendo*, that more could have been done, and that individual staff on occasion violated the policies put into place, that is not the measure of an Eighth Amendment claim. "Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with 'subjective recklessness as used in the criminal law.'" *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020) (quoting *Farmer*, 511 U.S. at 839–40). Given all of the safeguards put in place, which represent a reasonable response to the COVID-19 threat, Plaintiff could not prevail on his claim of cruel and unusual punishment even if he had established that Defendants' involvement amounted to more than simply occupying a supervisory position.

## D.     Fourteenth Amendment Claim

If Plaintiff's intention is to assert that Defendants violated State policies, procedures, rules, regulations, or State law, the mere violation of State law or regulation does not provide a basis for

---

[9] Vaccines were not available at the beginning of the pandemic.

a due process violation. *See, e.g. Baker v. McCollan*, 443 U.S. 137, 146 (1979); *Riccio v. Cnty. of Fairfax, Va.,* 907 F.2d 1459, 1469 (4th Cir. 1990) ("If the state law grants more procedural rights than the Constitution would otherwise require, a State's failure to abide that law is not a federal due process issue"); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996)). Accordingly, any Fourteenth Amendment claim Plaintiff seeks to raise in connection with compliance with the procedures put in place to stem the spread of COVID-19 at ECI is without merit.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion, construed as a Motion for Summary Judgment, is granted.[10] Plaintiff's Motions to Appoint Counsel (ECF No. 36) and for Default (ECF No. 38) are denied.

A separate Order follows.

Dated this __5__ day of __July__ , 2023.

FOR THE COURT:

James K. Bredar
Chief Judge

---

[9] Having found no constitutional violation, the court need not address Defendants' defense of qualified immunity.